IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 1:26-cv-95-RBJ

SERHAT GUNES,

Petitioner,

v.

MARKWAYNE MULLIN, TODD M. LYONS,
GEORGE VALDEZ, JUAN BALTAZAR,[1]
in their official capacities,

Respondents.

---

## ORDER

---

Before the Court is petitioner Serhat Gunes' ("petitioner" or "Mr. Gunes") Amended Petition for a Writ of Habeas Corpus ("Petition"), ECF No. 4, and Motion for an Emergency Temporary Restraining Order ("Motion"), ECF No. 5.[2]  Mr. Gunes seeks an order declaring his current immigration detention unlawful and requiring respondents to release him immediately or else provide him with a prompt

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Markwayne Mullin and George Valdez have automatically been substituted as parties in their official capacities as Secretary for the Department of Homeland Security ("DHS"), and Acting Director of the Denver Field Office, U.S. Immigration and Customs Enforcement ("ICE"), respectively.

[2] The Court previously granted Mr. Gunes' Motion to the extent that it ordered that respondents shall not transfer petitioner outside of the District of Colorado or remove him from the United States during the pendency of this proceeding. *See* ECF No. 7.

1

bond hearing before an Immigration Judge ("IJ").  ECF No. 4 at 26.  The matter is fully briefed.  ECF Nos. 4, 5, 11, and 14.  Respondents oppose the requested relief.

For the reasons set forth below, the Court agrees that Mr. Gunes' mandatory detention is unlawful, and orders that respondents release him forthwith.

## I.    Background

Mr. Gunes is a Turkish national seeking asylum in the United States.  ECF No. 4 at ¶ 22.  He entered the country without inspection on November 9, 2024, and shortly thereafter was encountered by U.S. Customs and Border Patrol ("CPB").  *Id.*

Upon apprehension, Mr. Gunes was initially placed in expedited removal proceedings.  *See* ECF No. 11 at 2.  When Mr. Gunes declared an intent to apply for asylum, he was referred for a credible fear interview, and on December 7, 2024, an asylum officer found that Mr. Gunes established a credible fear of persecution if returned to Turkey.  *Id.*

That same day, Mr. Gunes was issued a Notice to Appear ("NTA") for full immigration proceedings pursuant to 8 U.S.C. § 1229a.  *See* ECF No. 5-1.  The NTA charged him with being inadmissible both as "an alien present in the United States without being admitted or paroled," 8 U.S.C. § 1182(a)(6)(A)(i), and "as an immigrant who, at the time of application for admission" was not in possession of a

2

valid travel or entry document, *id.* § 1182(a)(7).[3]  *Id.*  The NTA also indicated that his "Section 235(b)(1) order was vacated pursuant to 8 C.F.R. § 208.30."  *Id.*

On January 3, 2025, ICE released Mr. Gunes from detention on an order of parole under 8 U.S.C. § 1182(d)(5)(A).  *See* ECF No. 5-2 ("Interim Notice Authorizing Parole," hereafter "Interim Notice").  By the express terms of the Interim Notice, Mr. Gunes' parole was "valid for one year," and would "automatically terminate upon [his] departure or removal from the United States or at the end of the one-year period" unless ICE decided to extend it.  *Id.*  The Interim Notice further advised Mr. Gunes that ICE could "terminate parole on notice prior to the automatic termination date," and as his parole was "entirely in the discretion of ICE," it could "be terminated at any time and for any reason."  *Id.*

After his release, Mr. Gunes settled in Chicago, Illinois, where he has been pursuing his asylum case.  ECF No. 4 at ¶¶ 26-27.  Respondents do not dispute that he has complied with the terms of his parole and immigration proceedings, and has led a law-abiding life.  For reasons that are unclear, on December 31, 2025, Mr. Gunes was stopped and arrested by law enforcement while driving in Wyoming.  *Id.* at ¶ 28.  ICE subsequently took him into custody, and he has been detained at the Denver Contract Detention Facility in Aurora, Colorado ever since.  *Id.* at ¶¶ 28–30.

---

[3] This Order uses "alien" where that term appears in a statute, regulation, or case law.

On February 10, 2026, more than a month after Mr. Gunes was arrested, ICE issued him a letter entitled "Notice of Parole Termination." ECF No. 13-1. This letter stated that he was paroled for a period of one year and that "ICE has determined that the purpose of [his] parole has been accomplished," and "there are no other urgent humanitarian reasons or significant public benefit" to continuing his parole. *Id.* The letter also indicated that, because his parole was terminated, Mr. Gunes was "restored to the status that [he] had at the time ICE paroled [him] from custody," and thus, his detention is mandatory under 8 U.S.C. § 1225(b). *Id.*

## II.      Discussion

A district court may grant a writ of habeas corpus to any person who demonstrates that he is "in custody in violation of the Constitution or laws of the United States." 28 U.S.C. § 2241. The individual in custody bears the burden of proving that his detention is unlawful. *Walker v. Johnston*, 312 U.S. 275, 286 (1941). Section 2241 habeas proceedings are available as a forum for statutory and constitutional challenges to immigration detention. *See Zadvydas v. Davis*, 533 U.S. 678 (2001).

Where the dispute is fundamentally legal in nature, the court may decline to hold a hearing. 28 U.S.C. § 2243; *see, e.g.*, *Garcia Cortes v. Noem*, 1:25-cv-02677-CNS, 2025 WL 2652880, at *1 (D. Colo. Sept. 16, 2025). Here, neither party has requested a hearing, and the Court finds that no hearing is necessary.

4

Mr. Gunes raises two central challenges to his detention. Initially, he contends that his detention is governed by 8 U.S.C. § 1226(a), and is therefore discretionary, entitling him to release, or, at a minimum, a bond hearing. *See* ECF No. 4 (Counts One and Two). Separately, he argues that the termination of his parole violates his due process rights under the constitution, the Administrative Procedure Act, and ICE's own regulations. *See id.* (Counts Three and Four). Because the Court agrees that Mr. Gunes' detention is controlled by § 1226(a), it does not reach Mr. Gunes' other claims. *See Leyva Ramirez v. Baltasar*, 26-cv-00199-NYW, 2026 WL 318989, at *3-4 (D. Colo. Feb. 6, 2026) (granting habeas petition on the statutory claim and declining to reach other grounds).

## A. **Legal Background**

### 1. **Section 1226(a) vs. Section 1225(b)**

Under the Immigration and Nationality Act ("INA" or "the Act"), 8 U.S.C. § 1226(a) "sets forth the default rule for detaining noncitizens already present in the United States." *Martinez Escobar v. Baltazar*, 26-cv-00296-NYW, 2026 WL 503313, at *2 (D. Colo. Feb. 24, 2026) (internal quotation marks omitted). Under this section, detention is discretionary: DHS "may" detain a noncitizen during removal proceedings or it "may" release them on bond or conditional parole.[4] *See*

---

[4]Although not relevant here, this discretion is cabined by 8 U.S.C. §§ 1226(c) and (d) which direct the Attorney General to "take into custody" noncitizens who are deportable or inadmissible on enumerated criminal grounds and detain them throughout removal proceedings.

§ 1226(a)(1)–(2).  If DHS decides to detain the noncitizen, he has the right to seek a custody redetermination before an IJ, who may release him on bond or other conditions if the noncitizen demonstrates that he is neither a danger nor a flight risk. *See* 8 C.F.R. §§ 1236.1(c)(8), (d)(1); 8 C.F.R. § 1003.19(a).

"Section 1225(b) supplements § 1226's detention scheme."  *Martinez Escobar*, 2026 WL 503313, at *2 (internal quotation marks omitted).  This section "'applies primarily to [noncitizens] seeking entry into the United States,' i.e., 'applicants for admission,'" and for these noncitizens, detention is mandatory.  *Id.* Section 1225(b) contains two distinct, and mutually exclusive, mandatory detention regimes: §§ 1225(b)(1) and 1225(b)(2).  *See Kartashyan v. Warden of Golden State Annex Det. Facility*, No. 1:25-cv-1526-DC-SCR, 2025 WL 3771343, at *4 (E.D. Cal. Dec. 31, 2025) (noting that §§ 1225(b)(1) and (b)(2) "describe separate and non-overlapping categories").

Much of the recent litigation in this area has focused on the meaning of one provision in the latter regime: § 1225(b)(2)(A), sometimes referred to as the "catchall provision." *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018).  This case is different.  In the instant matter, respondents do not contend that Mr. Gunes is mandatorily detained pursuant to § 1225(b)(2)(A).  Instead, they claim that his case is governed by one provision in § 1225(b)'s *other* mandatory detention regime,

6

specifically, § 1225(b)(1)(B)(ii).  *See* ECF No. 11 at 2–3, 4–7.  This provision is part of § 1225(b)'s expedited removal framework, which the Court turns to now.

### 2. <u>Mandatory Detention During Expedited Removal Proceedings</u>

Section § 1225(b)(1), entitled "Inspection of Aliens Arriving in the United States and Certain Other Aliens Who Have Not Been Admitted or Paroled," details the screening of noncitizens for a process known as expedited removal.  This process applies to two different groups of noncitizens.

The first group falls under § 1225(b)(1)(A)(i), sometimes referred to as the "Arriving Aliens Provision."  *See, e.g.*, *Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274, 291 (E.D.N.Y. 2025).  Under this provision, noncitizens who are (1) "arriving in the United States" and (2) inadmissible on account of fraud/misrepresentation, 8 U.S.C. § 1182(a)(6)(C), or for lacking valid entry/travel documents, *id.* § 1182(a)(7), must be placed in expedited removal. § 1225(b)(1)(A)(i).

The second group falls under § 1225(b)(1)(A)(iii), sometimes referred to as the "Designation Provision."  *Rodriguez-Acurio*, 811 F. Supp. 3d at 291.  This provision permits the Attorney General, in her "sole and unreviewable discretion," to designate other classes of noncitizens subject to expedited removal.[5]

---

[5] The Attorney General has since delegated that authority to the Secretary of DHS. *Rodriguez-Acurio*, 811 F. Supp. 3d at 291.

§ 1225(b)(1)(A)(iii)(I).  A noncitizen in such a class is one who: (1) is inadmissible under §§ 1182(a)(6)(C) or (a)(7), (2) "has not been admitted or paroled into the United States," and (3) has not demonstrated two years of continuous, physical presence in the United States immediately prior to the inadmissibility determination. § 1225(b)(1)(A)(iii)(II); *see also* § 1225(b)(1)(A)(i).  In 2019, DHS "expanded expedited removal to the full scope of the statutory authority under the Designation Provision" to include all qualifying noncitizens encountered anywhere in the United States. *Coalition for Humane Immigrant Rights v. Noem*, 805 F. Supp. 3d 48, 63 (D.D.C. 2025) (detailing DHS' gradual expansion of the applicability of the Designation Provision).  DHS reinstated this policy in January 2025.  *Id.* at 64.

Expedited removal is distinct from full removal proceedings under 8 U.S.C. § 1229a, also known as section 240 proceedings, which entitle a noncitizen to a hearing before an IJ and include substantial procedural protections.  *See Rodriguez-Acurio*, 811 F. Supp. 3d at 290–91 (describing the procedural protections afforded to noncitizens under § 1229a).  By contrast, once a noncitizen subject to expedited removal is determined to be inadmissible by an immigration officer, he must be ordered "removed from the United States without further hearing or review."  § 1225(b)(1)(A)(i).  "Expedited removal lives up to its name."  *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 619 (D.C. Cir. 2020).  A removal order is typically "issued within a few days, if not hours."  *Rodriguez-Acurio*, 811 F. Supp. 3d at 292.

The only exception is where the noncitizen "indicates either an intention to apply for asylum . . . or a fear of persecution." § 1225(b)(1)(A)(ii).

Noncitizens who express this intention or fear must be referred to a U.S. Customs and Immigration Service ("USCIS") asylum officer for a credible fear interview. *Id.* § 1225(b)(1)(A)(ii). If the asylum officer makes a positive credible fear determination, USCIS "has complete discretion" to either transfer the noncitizen to full removal proceedings under 8 U.S.C. § 1299a, or, to "retain jurisdiction" for adjudication of the asylum application. 8 C.F.R. § 208.30(f). Section 1225(b)(1)(B)(ii) states that "the alien *shall be* detained for further consideration of the application for asylum." *Id.* (emphasis added).

Neither statute nor regulation explains exactly what "further consideration" of the asylum application means—and, therefore, whether detention remains mandatory where the noncitizen is transferred to full removal proceedings. Until relatively recently, noncitizens in the Designation Provision group who, like Mr. Gunes, were funneled from expedited removal to full proceedings after a credible fear finding were considered eligible for bond. However, in 2019, the Board of Immigration Appeals ("BIA") overruled its own precedent to hold that § 1225(b)(1) continues to mandate detention for all noncitizens "originally placed in expedited proceedings, even if they are later transferred to full proceedings after establishing

9

a credible fear." *In re M-S-*, 27 I. & N. Dec. 509, 516 (2019) (overruling *In re X-K*, 23 I. & N. 731 (BIA 2005)).

In reaching this conclusion, the BIA expressly relied on the Supreme Court's 2018 opinion in *Jennings*, 583 U.S. 281. *Id.* at 510. But *Jennings* is not so categorical. To be sure, *Jennings* holds that "§§ 1225(b)(1) and (b)(2) mandate detention of aliens throughout the completion of applicable proceedings and not just until the moment those proceedings begin," but that statement does not answer the question of what constitutes the "applicable" proceedings once a noncitizen in expedited removal establishes a credible fear. 583 U.S. at 302. Moreover, *Jennings* recognized a distinction between mandatory detention under § 1225(b)(1)(B)(ii)—which continues "until immigration officers have finished considering the application for asylum"—and § 1225(b)(2)(A)—which lasts "until removal proceedings have concluded." *Id.* at 300. This distinction, as well as the general reference to "immigration officers," who conduct initial credible fear interviews and may thereafter retain jurisdiction of the asylum application, as opposed to an "immigration judge," who presides over full removal proceedings, suggests that the BIA overread *Jennings* to support its broad construction of "further consideration of the asylum application."

Therefore, contrary to *M-S-*, the conclusion that detention is mandatory under § 1225(b)(1)(B)(ii) during full removal proceedings is neither compelled by the plain

language of the statute nor *Jennings*. While many courts have adopted the BIA's holding, some have questioned it or rejected it outright, and under *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), this Court is not bound to extend it deference. *See, e.g.*, *Quinteros Moran v. Joyce*, 25 Civ. 9645 (GBD), 2025 WL 3632895, at *3, n. 1 (S.D.N.Y. Dec. 12, 2025) (questioning whether *M-S-* reflects the "correct interpretation of the statute"); *Jimenez v. FCI Berlin*, 799 F. Supp. 3d 59, 67, n. 7 (D.N.H. 2025) (concluding that *M-S-* "misconstrues § 1225(b)(1)(B)(ii)'s plain language and is not persuasive"); *Portillo-Argueta v. Simon*, 1:25-cv-2285 (AJT-WEF), 2026 WL 184194, at *4 (E.D. Va. Jan. 23, 2026) (reaching the same conclusion). Nevertheless, because the Court concludes that Mr. Gunes' detention is discretionary on other grounds, it does not endeavor to resolve the statutory meaning of "further consideration of the application for asylum." Instead, the Court assumes, without deciding, that detention remains mandatory for a noncitizen transferred to full removal proceedings after establishing a credible fear.

### 3. Parole Under 8 U.S.C. § 1182(d)(5)(A)

Despite the mandatory nature of detention under § 1225(b), Congress created one statutory mechanism for discretionary release. Section 1182(d)(5)(A) provides that the DHS Secretary may "in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-cases basis

11

for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States."[6]  *Id*.

Parole is further governed by regulation.  *See* 8 C.F.R. § 212.5.  Relevant here, the regulation delineates the general circumstances under which parole may be justified "on a case-by-case basis" for noncitizens in expedited removal proceedings, "provided [they] present neither a security risk nor a risk of absconding."  *See id.* § 212.5(b).  In other words, a precondition for paroling a noncitizen subject to mandatory detention under § 1225(b)(1) is a finding that he is neither a danger nor a flight risk.  *See, e.g.*, *Singh v. Bondi*, 2:26-cv-00582-TLF, 2026 WL 799706, at *3 (W.D. Wash Mar. 23, 2026); *Rodriguez-Acurio*, 811 F. Supp. 3d at 283 (noncitizen's "parole into the United States under Section 1182(d)(5)(A) was premised by law on the determination that she did *not* pose a safety risk") (emphasis in original).

Parole under § 1182(d)(5)(A)—often referred to as "humanitarian parole" to distinguish it from "conditional parole" under § 1225(a)(2)(B)—"serves a unique function."  *Rodriguez-Acurio*, 811 F. Supp. 3d at 294.  The statute expressly states that such parole "shall not be regarded as an admission of the alien[.]" § 1182(d)(5)(A).    Nevertheless, "a Section 1182(d)(5)(A) parolee's physical

---

[6] The Secretary's authority has, in turn, been delegated by regulation to numerous officials. 8 C.F.R. § 212.5(a).  However, for the sake of clarity, this Order refers generally to the authority of the DHS Secretary unless further specification is necessary.

presence within the United States cannot be said to be unlawful or illegal because it is authorized …, and parole has long been understood to constitute lawful status," albeit a temporary and limited one. *Rodriguez-Acurio*, 811 F. Supp. 3d at 294 (internal quotation marks omitted). Unlike conditional parole, noncitizens released on humanitarian parole are eligible for certain Federal public benefits, can apply for adjustment of status, and seek employment authorization. *Id.*

By statute, humanitarian parole will be terminated where, "in the opinion" of the DHS Secretary, "the purposes of such parole … have been served[.]" § 1182(d)(5)(A). Parole can be terminated in one of two ways: automatically or on written notice. 8 C.F.R. § 212.5(e)(1)–(2). Where parole is terminated automatically—either when the noncitizen departs from the United States or "at the expiration of the time for which parole was authorized"—no written notice is required. *Id.* § 212.5(e)(1). Under the notice provision, parole may be terminated "upon the accomplishment of the purpose for which parole was authorized" or "when in the opinion" of an authorized DHS official "neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States." *Id.* § 212.5(e)(2). Many courts have read the statute and regulation to require, in every case, "an individualized . . . determination before parole can lawfully be revoked," calling the automatic termination provision into question. *Orellana v. Francis*, 25-CV-04212 (OEM), 2025 WL 2402780, at *5 (E.D.N.Y. Aug. 19, 2025);

13

*see also Y-Z-L-H v. Bostock*, 792 F. Supp. 3d 1123, 1145 (D. Or. 2025); *Noori v. LaRose*, 807 F. Supp. 3d 1146, 1168 (S.D. Cal. 2025).

In any event, 8 U.S.C. § 1182(d)(5)(A) states that upon the termination of parole, "the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.* The regulation further states that the noncitizen "shall be restored to the status that he or she had at the time of parole" and "[a]ny further inspection or hearing shall be conducted under section 235 or 240 of the Act, or any order of exclusion, deportation, or removal previously entered shall be executed." 8 C.F.R. § 212.5(e)(2)(i). However, if the noncitizen can't be removed "within a reasonable time," he "shall again be released on parole" unless it is determined that "the public interest requires that the alien be continued in custody." *Id.* Neither the statute nor regulation expressly state that a noncitizen paroled under § 1182(d)(5)(A) must be returned to the same statutory *detention regime* upon the termination of parole.

Having established the statutory and corresponding regulatory frameworks for detention under § 1226(a) and § 1225(b)(1), and humanitarian parole under § 1182(d)(5)(A), the Court now turns to the question of what statute governs Mr. Gunes' current detention.

B. **Analysis**

There is no question that, at the time of his initial encounter with CBP in 2024, Mr. Gunes was part of the class of noncitizens falling under the Designation Provision. As a noncitizen who (1) was inadmissible under 8 U.S.C. § 1182(a)(7) due to a lack of valid entry/travel documents, (2) had not been admitted or paroled, and (3) could not demonstrate two years of continuous, physical presence in the United States, he was properly placed in expedited removal proceedings. *See* 8 U.S.C. §§ 1225(b)(1)(A)(i), (iii)(I)–(II).

Then, after declaring his intent to apply for asylum, Mr. Gunes was properly provided a credible fear interview with an asylum officer, who made a positive credible fear determination. *See* ECF No. 11 at 2. USCIS subsequently issued Mr. Gunes a NTA, exercising its discretion to transfer Mr. Gunes's case to full removal proceedings. *See id.* This ended Mr. Gunes' expedited removal proceedings, but it did not end his mandatory detention. As discussed in Part II.A.2, above, the Court accepts, for the purposes of this Order, that, Mr. Gunes' detention remained mandatory at that time under 8 U.S.C. § 1225(b)(1)(B)(ii).

However, there was an intervening event. Specifically, "ICE exercised its discretionary authority to parole [Mr. Gunes] into the United States under 8 U.S.C. § 1182(d)(5)(A)." ECF No. 11 at 3. Four days shy of his parole's automatic termination, ICE rearrested Mr. Gunes and returned him to detention. *Id.* The

question, then, is whether, at this time, Mr. Gunes' detention is still governed by § 1225(b)(1)(B)(ii), or whether, having been paroled, he is now outside its scope, and therefore subject to § 1226(a) and eligible for bond. In other words, what is the significance of Mr. Gunes' parole for his current detention authority?

To start, this case is distinguishable from those cited by Mr. Gunes, and the many like them, where ICE releases a noncitizen on conditional parole following a finding of credible fear despite their statutory ineligibility for that form of release. *See Murzi v. Noem*, 1:26-cv-00349-CNS, ECF No. 14 (D. Colo. Feb. 12, 2026); *Valencia Zapata v. Kaiser*, 801 F. Supp. 3d 919 (N.D. Cal. 2025); *see also Sidqui v. Almodovar*, ---F. Supp. 3d---, 25-CV-9349 (VSB), 2026 WL 251929 (S.D.N.Y. Jan. 30, 2026); *Luna Sanchez v. Bondi*, 1:25-cv-018888-MSN-IDD, 2025 WL 3191922 (E.D. Va. Nov. 14, 2025). Under those circumstances, courts have repeatedly found that "DHS' decision to release an individual on bond, as opposed to humanitarian parole under 8 U.S.C. § 1182(d)(5)(A), constitutes strong evidence that DHS intended to detain the individual under § 1226(a) and not under § 1225(b)." *Luna Sanchez*, 2025 WL 3191922, at \*4. But that did not happen here. Rather, ICE temporarily released Mr. Gunes on humanitarian parole according to the statutory framework. *See, e.g.*, *Walizada v. Trump*, 2:25-cv-00768, 2025 WL 3551972, at \*6 (D. Vt. Dec. 11, 2025) (stating that § 1182(d)(5)(A) parole is the "only exception" to mandatory detention under § 1225(b)) (internal quotation marks omitted).

16

Therefore, to the extent that Mr. Gunes relies on these cases to argue that ICE intended to detain him pursuant to § 1226(a), the Court finds them inapposite.

This conclusion, however, does not end the inquiry. As a matter of statutory analysis, there are still two possibilities. The first possibility is that Mr. Gunes' humanitarian parole under § 1182(d)(5)(A) did not change his detention authority upon the termination of that parole. The second possibility is that Mr. Gunes can no longer be detained under § 1225(b)(1)(B)(ii) because he does not fall under the Designation Provision, which triggers mandatory detention. No statute or regulation directly addresses this question and there is no binding authority. District courts across the country have come down on both sides, though a clear majority side with Mr. Gunes, *see* note 7 below.

After careful review of the decisions on both sides, and conducting its own statutory analysis, the Court concludes, for the reasons below, that Mr. Gunes' release on humanitarian parole ended his detention under § 1225(b)(1)(B)(ii), he is no longer eligible for mandatory detention under that provision, and therefore his current detention is pursuant to § 1226(a).

### 1. **Mr. Gunes' parole renders him ineligible for the Designation Provision**

"As with any question of statutory interpretation, the Court begins with the text." *Coalition*, 805 F. Supp. 3d at 83 (internal quotation marks omitted). Here, the relevant text starts with § 1225(b)(1)(A)'s expedited removal provisions. *See*

*Rodriguez-Acurio*, 811 F. Supp. 3d at 298.  Recall that mandatory detention under § 1225(b)(1)(B)(ii) depends initially on Mr. Gunes qualifying for expedited removal either under the Arriving Aliens Provision, § 1225(b)(1)(A)(i), or the Designation Provision, § 1225(b)(1)(A)(iii).  Respondents do not argue that Mr. Gunes is an arriving alien, so the question is whether he falls under the Designation Provision. The answer depends on the meaning of that section's requirement that the noncitizen "has not been admitted *or paroled* into the United States."  *See, e.g.*, *Coalition*, 805 F. Supp. 3d at 83 (emphasis in the original).

There are two ways to read this requirement, which is phrased in "the negative form of the present-perfect tense."  *Id.* (internal quotation marks omitted).  "[A]s a matter of pure semantics," the present-perfect tense can "refer to a time in the indefinite past *or* to a past action or state that continues into the present."  *Id.* (emphasis in original).  Therefore, under the reading that favors Mr. Gunes, Congress' use of the negative form of the present-perfect tense indicates "that the event *neither* happened in the indefinite past *nor* is continuing into the present."  *Id.* (emphasis in original).  Simply put, if a noncitizen has, at any point, been paroled— even if that parole has since expired or been terminated—the Designation Provision does not apply to him.  *Id.*

The other way to read the negative present-perfect tense phrase "has not been admitted or paroled into the United States" is that "the event in question continues

to be true or valid." *Id.* (internal quotation marks omitted). Under this construction, an otherwise qualifying noncitizen is subject to the Designation Provision *unless* he is presently paroled. *See id.* ("the Designation Provision exempts only those whose parole has not been terminated and continues to be valid"). The Supreme Court adopted this construction of the present-perfect tense in the context of the First Step Act, finding that a criminal sentence that "has not been imposed" includes one that "has no continued legal validity," even if, as in the case of a vacated sentence, it did at some point in the past. *Id.* (quoting from and explaining *Hewitt v. United States*, 606 U.S. 419, 429 (2025)). Under this reading, Mr. Gunes would fall under the Designation Provision because his parole exempted him only so long as it was ongoing.

Faced with two facially plausible readings, the Court must employ tools of statutory analysis to choose the best one. *See Loper Bright Enters.*, 603 U.S. at 400 (all statutes "no matter how impenetrable, do—in fact, must—have a single, best meaning"). Numerous courts, including at least two in this district, have conducted thorough analyses of the phrase "has not been admitted or paroled" in this context, and concluded that "paroled" refers to a discrete event and not an ongoing state. *See, e.g.*, *Coalition*, 805 F. Supp. 3d at 81–89; *Rodriguez-Acurio*, 811 F. Supp. 3d at 298–305; *Khubiev v. Baltasar*, 25-cv-03955-STV, 2026 WL 864237, at *2–6 (D. Colo. Mar. 30, 2026); *Rafibaev v. Noem*, 26-cv-00461-PAB, 2026 WL 607559, at *2–5

19

(D. Colo. Mar. 4, 2026);  *Qasemi v. Francis*, 25-cv-10029 (LJL), 2025 WL 3654098, at *7–13 (S.D.N.Y. Dec. 17, 2025); *Salgado Bustos v. Raycraft*, 25-13202, 2025 WL 3022294, at *5-7 (E.D. Mich. Oct. 29, 2025); *Aviles-Mena*, 25-cv-06783-RFL, 2025 WL 2578215, at *3–5 (N.D. Cal. Sept. 5, 2025).[7]  The Court is persuaded by their reasoning and joins them.

First, the Court considers Congress' placement of the word "paroled" alongside the word "admitted."  *See* § 1225(b)(1)(A)(iii)(II) ("An alien … who has not been admitted or paroled").  As the court in *Coalition* explained, under the canon of *noscitur a sociis*, "a word is given more precise content by the neighboring words with which it is associated."  805 F. Supp. 3d at 84 (internal quotation marks and citation omitted).  And while "parole" can "refer to both a manner of entry and a status," an "admission is something that happens at a specific point in time; it is not

---

[7] For further support, *see, e.g. Badlov v. Noem*, 1:26-cv-162, 2026 WL 943586, at *4–5 (S.D. Ohio Apr. 8, 2026); *Kumar v. Johnson*, CIV-26-352-J, 2026 WL 937560, at *2 (W.D. Ok. Apr. 7, 2026); *Calvette Chirinos v. Mullin*, 26-cv-369, 2026 WL 905416, at *2–3 (E.D. Wisc. Mar. 30, 2026); *Rodriguez-Valencia v. Noem*, 3:26-cv-297-MMH-PDB, 2026 WL 730318, at *5–6 (M.D. Fla. Mar. 16, 2026); *Bashir K.A. v. Klang*, 25-cv-4559 (KMM.DJF), 2026 WL 452353, at *4–7 (D. Minn. Feb. 17, 2026); *Mohd v. Noem*, 2:26-cv-680 (NJC), 2026 WL 363525 (E.D.N.Y. Feb. 9, 2026); *Suarez-Lugo v. Bondi*, 5:26-CV-00029, 2026 WL 332317 (S.D. Tex. Feb. 6, 2026); *Martinez Gamez v. Easterwood*, 4:26CV3009, 2026 WL 295400, at *4 (D. Neb. Feb. 4, 2026); *Vasquez-Rosario v. Noem*, 25-cv-7427, 2026 WL 196505 (E.D. Pa. Jan. 26, 2026); *A.F.A.M. v. Albarran*, 25-cv-10492-AMO, 2025 WL 375190, at *2 (N.D. Cal. Dec. 22, 2025); *Said v. Noem*, 3:25-cv-00938-MOC, 2025 WL 3657217, at *4–6 (W.D.N.C. Dec. 17, 2025); *Singh v. Albarran*, 1:25-cv-01821-DAD-SCR (HC), 2025 WL 3640678, at *2 (E.D. Cal. Dec. 16, 2025); *Rodriguez v. Rokosky*, No. 25-17419 (CPO), 2025 WL 3485628, at *2 (D.N.J. Dec. 3, 2025); *E.V. v. Raycraft*, 4:25-cv-2069, 2025 WL 2938594, at *3 (N.D. Ohio Oct. 16, 2025); *Espinoza v. Kaiser*, 1:25-cv-01101 JLT, SKO, 2025 WL 2675785, at *5 (E.D. Cal. Sept. 18, 2025); *Munoz Materano v. Arteta*, 804 F. Supp. 3d 395, 414 (S.D.N.Y. Sept. 12, 2025).

a continuing status." *Id.* (internal quotation marks and citations omitted).  Their pairing here suggests that Congress intended "paroled" to refer to a manner of entry. *See id.*; *see also Rodriguez-Acurio*, 811 F. Supp. 3d at 300 ("Accordingly, the clause 'admitted or paroled' does not refer to a legal status but rather to the event of entry into the United States via admission or parole, which either did or did not occur").

Bolstering this interpretation is the use of the word "into" in the phrase "has not been . . . paroled *into* the United States," which, given its ordinary meaning, "conveys entrance inside of a location, rather than a status." *Rodriguez-Acurio*, 811 F. Supp. 3d at 300.  The use of the word "into," therefore, roots the phrase in a particular moment in time as opposed to a present condition.

Second, the Court considers that, for some purposes, a noncitizen's parole continues to have legal effect even after the parole has ended.  For instance, a noncitizen who is neither admitted nor paroled "is generally ineligible to apply for adjustment of status."  *Coalition*, 805 F. Supp. 3d at 84–85 (citing 8 C.F.R. § 245.1(b)(3)).  However, a noncitizen who is paroled into the country continues to be eligible for adjustment of status even after their parole expires or is terminated. *Id.*; *see also* 8 U.S.C. § 1255(a) (providing that the Attorney General may adjust the status of "an alien who was inspected and admitted *or* paroled") (emphasis added). In other words, the INA and the implementing regulations do not treat expired or terminated parole as if it never happened—some change has been affected.  *See*

*Aviles-Mena*, 2025 WL 2578215, at *4 ("termination of parole does not generally require treating noncitizens as if they had never been paroled in the first place").

In *Hewitt*, the Supreme Court found that a vacated sentence "has not been imposed," within the meaning of the First Step Act, in part because a vacated sentence is a legal nullity. 606 U.S. at 431–33. The inverse is true here. As discussed below, nothing in the text of 8 U.S.C. § 1182(d)(5)(A) or its implementing regulations "require the Court to pretend that [Gunes] was never paroled and permitted to live freely in the country" for a period of time. *Qasemi*, 2025 WL 3654098, at *11 ("The termination of parole, unlike the vacatur of a sentence [as in *Hewitt*], does not render that parole 'void *ab initio*.'").

Putting these textual clues together, the Court finds that the better meaning of Section 1225(b)(1)(A)(iii)(II) "does not authorize designation for expedited removal of any noncitizen who has, at any point in time, been paroled into the United States." *Avila-Mena*, 2025 WL 2578215, at *4. An everyday analogy illustrates the point. Imagine a concert policy that states: "Anyone who has not been admitted or escorted into the backstage area must remain in general admission." The policy's application to a particular concertgoer would naturally depend on whether they had ever gone backstage with permission, even briefly. If the concert venue instead intended to exclude persons whose backstage passes had expired or were revoked, it would not frame the policy in terms of prior entry, but in terms of current authorization (i.e.

22

"Anyone who is not admitted or escorted backstage must remain in general admission").

Because Mr. Gunes is beyond the reach of the Designation Provision by virtue of his parole, he is also beyond the reach of mandatory detention under 8 U.S.C. § 1225(b)(1)(B)(ii). *See Qasemi*, 2025 WL 3654098, at \*9 ("And if the noncitizen does not fall within the provision that serves as a gateway for expedited removal (regardless [if] the case[ ] take[s] the path of expedited removal or a 240 hearing), the noncitizen is not subject to the mandatory detention regime applicable to all those who fit within the gateway's criteria.").

2. **Section 1182(d)(5)(A), the parole regulations, and the "entry fiction" do not compel mandatory detention.**

Against this conclusion, respondents posit that the humanitarian parole statute provides that, upon the termination of parole, a noncitizen who was detained under § 1225(b) must be returned to mandatory detention. *See* ECF No. 11 at 7–8. It does not. Again, the Court starts with the text. Section 1182(d)(5)(A) states, in relevant part:

> such parole of such alien *shall not be regarded as an admission of the alien* and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served *the alien shall forthwith return or be returned to the custody from which he was paroled* and thereafter *his case shall continue to be dealt with in the same manner as that of any other applicant for admission* to the United States.

23

(emphasis added).  Respondents' argument boils down to the three commands in the excerpted text: (1) parole "shall not be regarded as an admission"; (2) the noncitizen "shall forthwith return or be returned to the custody from which he was paroled"; and (3) the noncitizen's case "shall continue to be dealt with in the same manner as that of any other applicant for admission."  None of these commands require mandatory detention upon the termination of parole.

To begin, it is of no moment that a noncitizen's parole is not regarded as an admission.  This clause simply preserves the statutory distinction between admission "after inspection and authorization by an immigration officer" and parole.  8 U.S.C. § 1101(a)(13)(A) (defining "admission").  Lawful admission has a host of legal consequences for a noncitizen, including the grounds upon which they can be removed from the country, the burden of proof at their removal proceedings, and the avenues for relief from removal that are available to them.  *See* 8 U.S.C. §§ 1227(a), 1229a(C)(3)(A), 1229b(a).  Section 1182(d)(5)(A) makes clear that those consequences do not attain to a noncitizen who has been paroled.  It does not, however, dictate what detention regime governs upon their return to custody.

The same is true with respect to the second statutory command that the noncitizen "shall forthwith return or be returned to the custody from which he was paroled."  8 U.S.C. § 1182(d)(5)(A).  Initially, "custody" is not the equivalent of "detention."  *See Qasemi*, 2025 WL 3654098, at *10 (distinguishing "custody,"

24

which "concerns any status under which a person or thing is under the care and control of another for inspection, preservation or security" from physical detention) (internal quotation marks omitted). The fact that Congress chose to use the word "custody" in the parole statute when it clearly knew how to use "detain" or "detention" elsewhere in the INA is significant. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(ii) ("the alien shall be *detained* for further consideration of the application for asylum"), (b)(2) ("the alien shall be *detained* for a proceeding under section 1229a of this title"); 1226(a) ("an alien may be arrested and *detained* pending a decision on whether the alien is to be removed from the United States") (emphases added).

Furthermore, reading this phrase to "require someone who has been paroled to be detained" would render that portion of the Designation Provision that excludes a paroled noncitizen from mandatory detention "entirely illusory." *Qasemi*, 2025 WL 3654098, at *11. As "there is no indication Congress intended the instruction in Section 1182 to automatically override" another part of the same statutory scheme, the Court will not treat the conflicting language in §1225(b)(1)(A)(iii)(II) as mere "surplusage." *Id.* (internal quotation marks omitted). This is especially so because reading § 1225(b)(1)(A)(iii)(II) to mandate detention unless and until a noncitizen is paroled under § 1182(d)(5)(A) but discretionary thereafter renders

25

these provisions "compatible, not contradictory." *Id.* (internal quotation marks omitted).

The third command, which states that a noncitizen's case "continue to be dealt with in the same manner as any other applicant for admission" upon the termination of parole, does not mandate detention either. Respondents' argument depends on Mr. Gunes, as an "applicant for admission," being subject to mandatory detention under 8 U.S.C. § 1225(b)(1)(B)(ii)—the only detention authority that they invoke. But not all "applicants for admission," defined in 8 U.S.C. § 1225(a)(1) as "[a]n alien present in the United States who has not been admitted or who arrives in the United States …," are subject to mandatory detention under § 1225(b), let alone that specific provision.[8] Section 1225(b)(1), by its terms, applies only to a subset of such individuals—those placed in expedited removal proceedings—not to all noncitizens who fall within the statutory definition of "applicant for admission."

---

[8] This Court, and the majority of district courts around the country, have found that 8 U.S.C. § 1226(a), rather than 8 U.S.C. § 1225(b)(2)(A), governs the detention of noncitizens who are apprehended in the country years after effecting an unlawful entry. *See, e.g.*, *Ugarte Hernandez v. Baltazar*, 1:25-cv-04066-RBJ, ECF No. 16 (D. Colo. Jan. 15, 2026); *Garcia Cano v. Holt*, CIV-25-01228-JD, 2026 WL 736461, at *2 (W.D. Ok. Mar. 16, 2026) (recognizing that this is the position of the "the majority of district courts," but noting that "a growing minority of courts have reached the opposite conclusion"). The Court is also aware that two appellate courts have concluded that § 1225(b)(2)(A) does mandate detention for all applicants for admission not subject to expedited removal, *see Buenrostro-Mendez v. Bondi*, 166 F. 4th 494 (5th Cir. 2026), *Avila v. Bondi*, ---F. 4th---, 2026 WL 819258 (8th Cir. Mar. 25, 2026), while a third has taken the opposite view, *see Castañon-Nava v. DHS*, 161 F. 4th 1048 (7th Cir. 2025). The Tenth Circuit has not weighed in yet, but is expected to do so soon.

As Judge Brimmer recently explained, this provision of § 1182(d)(5)(a) simply means that "a noncitizen whose parole is expired is treated like the vast majority of undocumented immigrants currently living in this country who are not subjected to expedited removal." *Rafibaez*, 2026 WL 607559, at *4. "Therefore, any determination as to [Mr. Gunes'] detention must be conducted under the discretionary framework of Section 1226(a), which governs the process of arresting and detaining noncitizens who have already entered the United States pending their removal." *Qasemi*, 2025 WL 3654098, at *12 (internal quotation marks and citations omitted).

Nor does 8 C.F.R. § 212.5(e)(2)'s command that, upon termination, a noncitizen "shall be restored to the status that he or she had at the time of parole," alter this conclusion. *Id.* This regulation is best read as mirroring the statute's directive that a parolee's case shall be "dealt with in the same manner as any other applicant for admission" after his parole concludes. § 1182(d)(5)(A). Neither expedited removal nor the mandatory detention that accompanies it constitute a "status." It follows that the regulation's text cannot be understood to require restoration of those conditions. Rather, the noncitizen simply loses parole and most of its attendant benefits and is again subject to the same statutory framework that governs other applicants for admission. *Qasemi*, 2025 WL 3654098, at *10.

This regulation also does not compel Mr. Gunes' mandatory detention on the grounds that it provides that, after a noncitizen's parole is terminated, "[a]ny further inspection or hearing shall be conducted under section 235 or 240 of the Act." 8 C.F.R. § 212.5(e)(2)(i).  Section 235 contains more than the provisions pertaining to expedited removal; it governs "inspection by immigration officers, generally." *Coalition*, 805 F. Supp. 3d at 88.  Therefore, this language "is easily read" as providing for "either inspection under section 235 (which can then lead to either expedited or regular removal proceedings), or, if the parolee does not require any 'further inspection,' to section 240 proceedings." *Id.* at 89.  Mr. Gunes was already inspected under section 235 shortly after his entry into the United States, and has since been transferred to section 240 proceedings.  He is now ineligible for expedited removal proceedings.  Under these circumstances, the regulation is best read as directing that Mr. Gunes receive a final hearing consistent with section 240 to determine whether he may remain in the United States—and not as conferring a particular detention regime upon his return to custody.

Finally, the "entry fiction" does not require Mr. Gunes' mandatory detention. As most recently described by the Supreme Court, this doctrine provides that "aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'"  *DHS v. Thuraissigiam*, 591 U.S. 103, 140 (2020).  While the precise

28

contours of this doctrine are beyond the scope of this Order, even in its strongest formulation, is does not control the question presented here.

At bottom, the "entry fiction" concerns the scope of *constitutional* protections afforded to noncitizens "on the threshold of initial entry" with respect to the removal process. *Destino v. FCI Berlin, Warden*, 1:25-cv-0374-SE-AJ, 2025 WL 4010424, at \*5 (D.N.H. Dec. 24, 2025) (quoting *Shaughnessy v. U.S. ex rel. Mezei*, 345 U.S. 206, 212–13 (1953)). Thus, even assuming that Mr. Gunes' release on humanitarian parole affords him no greater due process protection than when he first encountered CBP, he still may invoke those rights "that Congress has provided by statute." *Walizada*, 2025 WL 3551972, at \*16. And here, that is enough. Because his detention is governed by § 1226(a), he is entitled to that provision's protections, which includes the possibility of release during removal proceedings.

\*\*\*

Accordingly, Mr. Gunes' current mandatory detention is unlawful. This conclusion follows from the text of §§ 1225(b)(1)(A)(iii)(II) and 1182(d)(5)(A), and it accords with the INA's larger structure and purpose. Section 1225(b)(1) is not a standalone detention regime. It is tied to a particular process—expedited removal— that, as the name makes clear, is intended to facilitate rapid expulsion from the United States. This process is limited to certain "arriving aliens" and other recent, unlawful entrants, who, as a general rule, do not have the same established ties to

29

this country as noncitizens who have lived inside the United States for a long time. For noncitizens in expedited removal, Congress made the determination that the legitimate goals of immigration detention—preventing danger to the community and flight risk—were better served by (typically brief) mandatory detention rather than bearing the time and expense of conducting an "inquiry into the[ ] true character" of every person through a bond hearing or other custody proceeding. *Demore v. Kim*, 538 U.S. 510, 523 (2003) (internal quotation marks omitted).

A grant of humanitarian parole changes this calculus. Once ICE "affirmatively chooses to release an individual on parole, it has made the determination that it no longer intends to fast-track their removal," and also decided that mandatory detention is no longer necessary for that individual. *Aviles-Mena*, 2025 WL 2578215, at *5. Parole may later expire or be terminated, and the government may again take the noncitizen into custody. But nothing in the statute permits the government to treat the intervening period as though it never happened and to reimpose mandatory detention under an expedited removal framework the noncitizen no longer qualifies for.[9] At that point, detention is governed by § 1226(a), which provides for discretionary custody and individualized review, consistent with

---

[9] Mr. Gunes is a perfect example. He is not in expedited removal proceedings as a matter of fact because the government transferred him to full removal proceedings, nor is he eligible for these proceedings as a matter of law on account of his parole.

the treatment of the many other applicants for admission who live freely inside the United States.

## C. Remedy

The Court now turns to the appropriate relief.  "Federal district courts have broad equitable powers in ordering habeas relief." *Munoz Teran v. Bondi*, No. 25-cv-01218-KWR-SCY, 2026 WL 161527, at *6 (D.N.M. Jan. 21 2026) (internal citation omitted).  And in issuing a writ of habeas corpus, a federal court has the power and authority to dispose of habeas corpus matters "as law and justice require." 28 U.S.C. § 2243.

Although a noncitizen detained pursuant to § 1226(a) is entitled to a bond hearing, in the instant matter, the Court finds that release is the only appropriate remedy for Mr. Gunes' unlawful detention. *See Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("the essence of habeas corpus is an attack by a person in custody upon the legality of that custody . . . and [ ] the traditional function of the writ is to secure release from illegal custody").

Two considerations lead to that conclusion.  First, as discussed, when immigration officials granted Mr. Gunes humanitarian parole, "they necessarily determined that [he] did not present a flight risk or danger to the community." *Daza v. Albarran*, 25-cv-10214-RFL, 2026 WL 81518 (N.D. Cal. Jan. 12, 2026); *see also* 8 C.F.R. § 212.5(b).  Respondents do not contend that anything changed in the year

31

that he remained on parole. To the contrary, the record reflects that he did everything that was asked of him, and his asylum application is still pending. The government offers no justification for his arrest and re-detention beyond its belief that it has the authority to do so. Respondents did not arrest Mr. Gunes pursuant to a warrant, "a prerequisite to even discretionary detention under § 1226(a)." *Bashir K.A.*, 2026 WL 452353, at *7. Under these circumstances, it would be unfair to place petitioner in the position of having to demonstrate his fitness for bond, or even to allow the government to maintain his custody without providing him a pre-deprivation hearing.

Second, respondents plainly terminated Mr. Gunes' parole in violation of 8 C.F.R. § 212.5(e). He was arrested prior to the automatic termination of his parole "at the expiration of the time for which parole was authorized," *id.* § 212.5(e)(1), and therefore, his parole could only be terminated upon written notice. *Id.* § 212.5(e)(2). Respondents did not follow this procedure, arresting Mr. Gunes and terminating his parole without notice of any kind until they furnished it more than one month later. The Court need not determine that—absent his mandatory detention under the wrong statute—this procedural violation would be enough to warrant his release. However, respondents' flagrant disregard for their own binding regulations supports the conclusion that release is the appropriate remedy.

This conclusion is consistent with that of many other courts that have found that a petitioner wrongfully detained under § 1225(b)(1) following the termination of their humanitarian parole is entitled to release. *See, e.g.*, *Rodriguez-Acurio*, 811 F. Supp. 3d at 320; *Qasemi*, 2025 WL 3654098, at *14; *Suarez-Lugo*, 2026 WL 332317, at *13; *Bashir K.A.*, 2026 WL 452353, at *7.

Accordingly, for the reasons above, Mr. Gunes' present mandatory detention under § 1225(b)(1)(B)(ii) is unlawful and he must be released forthwith.

### **ORDER**

Therefore, it is hereby ORDERED that:

1. The Petition, ECF No. 4, is GRANTED. The Motion, ECF No. 5, is respectfully DENIED as moot. Respondents SHALL release petitioner on his own recognizance within 48 hours of this Order.

2. Respondents SHALL NOT impose additional release conditions other than those that petitioner was subject to prior to his December 31, 2025 rearrest.

3. Respondents SHALL transport or provide transportation for petitioner back to Chicago, Illinois, should petitioner request it. Respondents may secure his transportation and then release him from their custody, or, in the alternative, maintain him in their temporary custody for the sole purpose of effectuating his return to Chicago, Illinois. In either case, his custody SHALL NOT be maintained more than 48 hours from this Order.

4.  The parties SHALL, within five (5) days of this Order, file a joint status report informing the Court of the status of petitioner's release.

It is SO ORDERED.[10]

Dated: April 20, 2026                    BY THE COURT:

R. Brooke Jackson
Senior United States District Court Judge

---

[10] To the extent petitioner seeks attorneys' fees, he is directed to file a separate motion complying with the Federal Rules of Civil Procedure and the Local Rules.